## Relly v. City of Easton et al.

*Asher Seip* and *Dudley A. Giberson,* for plaintiff.
*Frank P. McCluskey* and *Newton R. Turner,* for defendants.

STEWART, P. J., June 25, 1928.—The following is a summary of the facts: R. F. Relly, as a resident, citizen and taxpayer of the City of Easton, filed his bill, alleging that he was the lowest responsible bidder for certain sewer work in the City of Easton. His bid was $68,302.45. At the time of the opening of the bids, there was one of W. T. S. Critchfield for $69,216.50. Council referred the bids to the Department of Streets and Public Improvements for investigation. Kenneth F. Kressler, a councilman, was superintendent of that department, and the Bureau of Water Works and Sewerage was a sub-department of the Department of Streets and Public Improvements. G. D. Andrews was the chief engineer of the bureau. The said Kressler and Andrews made an investigation of the plaintiff, R. F. Relly, inquiring into his ability as a contractor, his efficiency, his standing as a business man, his experience and his judgment. The Mayor and Council of the City of Easton held a conference, and reports were received as to the investigation into Mr. Relly's standing. The city solicitor was present at the conference, and advised council as to their duties. At a regular meeting of the City Council, council publicly awarded the contract to W. T. S. Critchfield. Plaintiff was present at the meeting, and asked council for their reasons in not awarding the contract to him, and was informed that council had nothing further to

say. The minutes of council record the awarding of the contract, but do not disclose the results of the investigation of Relly. Upon the hearing, a large amount of testimony was taken as to the work which plaintiff had done in the places where the City Council had investigated Mr. Relly, and witnesses were called to show that Relly had satisfactorily performed his contract, and in some instances witnesses were called against his contention. Three members of council testified as to personal investigations, and two admitted that they had been influenced largely by Critchfield's ability as a contractor, which was known to them.

## Discussion.

We have already referred to the wide scope which the investigation covered. We shall endeavor to keep the discussion within narrow limits, because we think that the questions involved are well settled in Pennsylvania. The leading case is Com. ex rel. Snyder et al. v. Mitchell, 82 Pa. 343. In that case, after referring to the words in the Act of May 23, 1874, P. L. 233, Mr. Justice Gordon said: "Now the court below, though they found, under the evidence, that the relators were responsible in all points in which the city had a right to inquire, yet they held that the word 'responsible,' as employed in the act, when applied to contracts requiring for their execution not only pecuniary ability, but also judgment and skill, imposes not merely a ministerial duty upon the city authorities, such as would result did their powers extend no further than to ascertain whose was the lowest bid, and the pecuniary responsibility of the bidder and his sureties, but also duties and powers which are deliberative and discretionary. In this we concur with the court below. For it is scarcely open to doubt but that the word under consideration, as it is used in the statute, means something more than pecuniary ability. In a contract such as the one in controversy, the work must be promptly, faithfully and well done; it must or ought to be conscientious work; to do such work requires prompt, skillful and faithful men. A dishonest contractor may impose work upon the city, in spite of the utmost caution of the superintending engineer, apparently good, and even capable of bearing its duty for a time, which in the end may prove to be a total failure and worse than useless. Granted, that from such a contractor pecuniary damages may be recovered by an action at law; that is, at best, but a last resort, that often produces more vexation than profit—a mere patch upon a bad job; an exceedingly meager compensation, at best, for the delay and incalculable damage resulting to a great city from the want of a competent supply of water. The city requires honest work, not lawsuits. Were we to accept the interpretation insisted upon by the relators, the difference of a single dollar, in a bid for the most important contract, might determine the question in favor of some unskillful rogue as against an upright and skillful mechanic. Again, we know that, as a rule, cheap work and cheap workmen are but convertible terms for poor work and poor workmen, and if the city, for the mere sake of cheapness, must put up with these, it is indeed in a most unfortunate position. It is unnecessary, therefore, to resort to authority for the condemnation of the interpretation, by which the ruling of the court below is sought to be overturned, for it is opposed to the unbiased judgment of all reflecting men, whether lawyers or laymen, and its adoption would be productive of far more evil than good." In Douglass et al. v. Com., 108 Pa. 559, the syllabus is: "In the Act of Assembly approved May 23, 1874, P. L. 233, directing contracts for supplies to be awarded to the lowest responsible bidder, the word 'responsible' does not refer to pecuniary ability only. The act calls

for an exercise of discretionary powers on the part of the city officers; and if they act in good faith, although erroneously or indiscreetly, mandamus will not lie to compel them to change their decision. . . . Nor was it material that A had not been judicially convicted of defrauding the city. If he had actually defrauded her, or if the commissioners, on evidence which they deemed satisfactory, believed that he had, their discretionary power to reject his bid could not be restrained by mandamus." In Interstate Vitrified Brick and Paving Co. v. Philadelphia, Mack Paving Co. et al., 164 Pa. 477, the lower court was of opinion that the Director of the Department of Public Works had no alternative but to award the contract to the lowest bidder who was able pecuniarily to carry out his contract. The Supreme Court said: "This was a misconception of the law as it has been repeatedly announced by this court." In Reuting et al. v. Titusville, 175 Pa. 512, the syllabus is: "Under the Act of May 23, 1874, P. L. 233, directing municipal contracts to be awarded to the 'lowest responsible bidder,' the municipal authorities, acting in their discretion and in good faith, may award the contract to a higher bidder, if considerations of superior skill, promptness or efficiency on the part of such bidder lead them so to do. When a municipal corporation has power to do any particular work, it may authorize its agents to make contracts for that purpose, and such contracts will be binding upon the corporation. The councils of a municipality may by ordinance and resolution refer bids for paving to a committee on streets, and empower such committee to enter into a contract for the work of paving." President Judge Henderson, now of the Superior Court, decided that case, and his opinion was affirmed by the Supreme Court. He discusses, on page 520, the right of a committee on streets to enter into a contract, and shows that it may be done. Under the Clark Act and its supplements, the executive and administrative power, authority and duties in every city of the third class shall be distributed into and among five departments. It is absolutely necessary in cities of the size and importance of Easton that municipal work should be done in that way, and no criticism can be made of council in referring the matter of the investigation of the plaintiff in this case to the Bureau of Water Works and Sewerage, nor was it incumbent upon each member of council to make an independent investigation. They had a perfect right to rely upon the information that was brought to them by Mr. Kressler and Mr. Andrews, but it must not be forgotten that the mayor and Dr. Clark had made an investigation of their own. One of the latest cases on the subject is Hibbs et al. v. Arensberg et al., 276 Pa. 24. In that case it appeared that the school board had not investigated the responsibility of three lower bidders than the one who received the contract. While Mr. Justice Kephart, in his opinion, discusses other features, that was the ground on which the case was reversed. In his opinion, he said: "Executive officers of municipal and school districts have many discretionary powers in performing their functions; ordinarily, courts will not interfere with this exercise; but if it appears their action is based on a misconception of law, ignorance through lack of inquiry into facts necessary to form intelligent judgment, or the result of arbitrary will or caprice, courts will intervene to prevent an abuse of power adverse to public welfare. Executive officers are clothed with the responsibility of originating and executing plans for the public good; the presumption is that their acts are on such considerations and their decisions reached in a legal way after investigation. When their actions are challenged, the burden of showing to the contrary rests on those asserting it, and it is a heavy burden; courts can and will interfere only when it is made apparent this discretion has been abused. Abuse of discre-

tion does not, as a rule, come from unwise acts or mistaken judgment, but generally springs from improper influences, a disregard of duty or a violation of law." Again he said: "The term 'lowest responsible bidder' does not mean the lowest bidder in dollars; nor does it mean the board may capriciously select a higher bidder, regardless of responsibility or cost. What the law requires is the exercise of a sound discretion by the directors; they should call to their assistance the means of information at hand to form an intelligent judgment. They should investigate the bidders to learn their financial standing, reputation, experience, resources, facilities, judgment and efficiency as builders. This was not done. The court below censures the board for omitting this important step, but it holds, inasmuch as they had ample knowledge of the successful bidder and the merit of its work, the contract could be awarded. This might do in private affairs, but will not pass when public funds are at stake; it is not the exercise of discretion. Though the directors were not bound in law to give the contract to the lowest bidder, who might be irresponsible, they were bound to investigate, and if a bidder measured up to the law's requirement as a responsible party, the board could not capriciously award the contract to another. Giving a bond alone does not make up for responsibility; we have too many bonding companies willing to indemnify almost anything. But there should be a sufficient reason, where a bidder is responsible, why the job was not given to him. And where such reason appears, the action of the board is generally conclusive." That case was followed in Hiorth v. Chester City, 282 Pa. 387. That case is peculiar. Both bidders had been previously engaged in municipal contracts, and were personally known to members of council. The city asked for bids for gathering garbage, and, secondly, for gathering ashes and rubbish. The contract for the rubbish was awarded to Firth for over $5000 more than Armstrong and Son bid, but at the same time council had awarded the garbage contract to Firth at a price much less than the difference in above bids. The Supreme Court affirmed the lower court in dismissing the bill because there was no allegation of fraud or misconduct on the part of city officials. Hibbs et al. v. Arensberg et al., 276 Pa. 24, was also followed in Day et al. v. Amwell Township School District, 283 Pa. 248, and in Summit Hill School Directors Removal, 289 Pa. 82.

The decisions of the highest courts of other states seem to be in accord with the above decisions. Three of them were cited by the learned counsel for the plaintiff: Williams v. City of Topeka et al., 85 Kan. 857, 118 Pac. Repr. 864 (1911). This is an action by a property owner to enjoin the Mayor and Commissioners of the City of Topeka from entering into a contract for paving. Bids were received for the work as provided by law. The bids considered were that of the Kaw Paving Company, a domestic corporation, for $54,777.30, and that of the Cleveland Trinidad Paving Company for $52,326.95. When the bids were opened, consideration was postponed for a week. The Cleveland Company was not known to the mayor and commissioners. One of the commissioners received a letter in response to a letter written to him by a commissioner of Wichita for information. The reply criticised the company. A telephone talk with a former mayor of Wichita elicited the same information, and others reported that the company had done some good work, but that some of it was rotten. At a meeting subsequently held, the president of the Cleveland Company and its attorney appeared before the commissioners, and the mayor announced that the bids for paving would be taken up and an opportunity given to any person who desired to be heard. The representatives of the company explained trouble that the company had had.

The mayor and commissioners made no further investigation, but awarded the contract to the Kaw Paving Company upon its bid. "Evidence was produced on the trial tending to show that the Cleveland Company had performed large contracts for paving in many cities to the satisfaction of their governing bodies, although it appeared that a criminal prosecution had been begun against its president in one of the cities, and that an action for an injunction was being prosecuted in another. Explanations were given of these proceedings tending to exculpation. Evidence of the good reputation of the company and its president were also produced." The lower court entered judgment for the defendant and plaintiff appealed. The higher court, in sustaining the judgment of the lower court, discussed the meaning of the expression "the lowest responsible bidder," and stated that the word "responsible" in the phrase "lowest responsible bidder" was used by the legislature in the sense in which it had long been interpreted by the courts and text-writers, and must be held to imply skill, judgment and integrity necessary to the faithful performance of the contract, as well as sufficient financial resources and ability. The court then considers how this responsibility is to be determined. "Here, again, the authorities speak with practically one voice. The governing body of the city—the mayor and council, or commissioners, as the case may be—must determine the fact, and such determination cannot be set aside, unless the action of the tribunal is arbitrary, oppressive or fraudulent. . . . The determination of the question who is the lowest responsible bidder does not rest in the exercise of an arbitrary and unlimited discretion, but upon a *bona fide* judgment, based upon facts tending to support the determination. . . . The statute will not be so interpreted as to afford a cover for favoritism. The city authorities are required to act fairly and honestly upon reasonable information, but when they have so acted, their decision cannot be overthrown by the court." The next question considered by the court was whether the facts before the mayor and commissioners tended to support their conclusion that the Cleveland Company was not the lowest responsible bidder, and whether they acted in good faith in awarding the contract to another. The court then held that, "in view of the information so obtained and other information before the commissioners, and the finding of the District Court that the award to the Kaw Paving Company was made in good faith, the judgment must be affirmed." The Supreme Court of Kansas also relied upon Com. *v.* Mitchell, *supra,* and Douglass et al. *v.* Com., *supra,* and, in our judgment, while the Kansas case was cited by both sides, yet it is really similar in its facts to the present case, and is one of the best discussions that were cited to us. Kelling et al. *v.* Edwards, 134 N. W. Repr. 221 (1912), is also a well-considered case, in which Com. *v.* Mitchell, as well as a large number of Pennsylvania authorities, are cited and followed. In that case the same point was made as here, that there should be a hearing. The Supreme Court of Minnesota said: "The plaintiffs' counsel insist that, even if the auditor had any discretion in determining the lowest responsible bidder, he had no right to reject bids on account of the irresponsibility of the bidders without giving them an opportunity to be heard. To support this contention they cite Faist *v.* Hoboken, 72 N. J. L. 361, 60 Atl. Repr. 1120. We are referred to no other case so holding, and clearly there would be practical difficulties in applying such a rule." Faist *v.* Hoboken, *supra,* contains no discussion of the point, but relies on McGovern *v.* Board of Works, 57 N. J. L. 580. The latter case, when examined, shows that the city charter of Trenton, N. J., provided that contracts shall be awarded "to the lowest bidder or bidders who shall give satisfactory proof of his or their ability," &c. There is nothing in the

opinion of the court that requires a public hearing. On the contrary, the Supreme Court of New Jersey refers to the Pennsylvania decisions to the effect that courts will not interfere to restrain municipal authorities, "unless it be shown that they have acted corruptly and in bad faith." The Minnesota court could have gone further and said that there was no case holding that a public hearing was necessary. In State ex rel. Eaves et al. *v.* Rickards et al., 40 Pac. Repr. 210, it is true that the State Furnishing Board did hold a hearing, and that the various bidders were questioned by the members of the board as to their financial responsibility, plant equipment, &c., but the Supreme Court of Montana did not hold that it was necessary to hold the hearing. As a matter of fact, it appeared from the opinion that the members individually got information as to the petitioner from outsiders, and it does not appear which kind of testimony influenced them in their action. Douglass et al. *v.* Com., 108 Pa. 559, and Com. *v.* Mitchell, 82 Pa. 343, were relied on by that court as authorities.

In the present suit, the plaintiff alleges that he sues as a resident, citizen and taxpayer. No question was raised as to his standing, for the good reason that it could not be successfully raised, but it is manifest that the plaintiff conducted the suit as a contractor whose bid was rejected. He could not have brought suit in that capacity because, until his bid had been accepted, there was no legal obligation between him and the city. See Wm. T. S. Critchfield *v.* Mayor and Aldermen of Jersey City, 132 Atl. Repr. 321, where the same party to whom this contract was awarded brought suit as a contractor. The mere possibility that Relly would have profits confers no legal standing on him. The action must be as it was in this case, directed against the city officials, and the burden is on him to prove that the city officials acted illegally, arbitrarily and capriciously, and in this he has failed. Nor do we think that there is any legal requirement that when bids are opened and the contract is not given to the lowest bidder, the council should have a public hearing upon the matter, or that the minutes of council should disclose council's reasons. As we quoted above, any such course would present innumerable difficulties and would result in injurious delays, and a meeting of council would turn into a perfect Babel if they were to have hearings of this kind. The presumption is that public officials will do their duty, and before they can be convicted of fraud or unfairness or favoritism, there must be strong proof. It is a matter of congratulation that there is not the slightest suspicion in the present case that any of the councilmen expected to profit by the awarding of the contract to Critchfield. They may have been unduly influenced in his behalf by the fact that he had done previous work, but unless it appears that that was the only thing that influenced them, we could not overrule their decision. Some of the cases have referred to the fact that the difference between the bids was a small one. In the present case it was approximately $900, but, in our judgment, that has little to do with the matter. We place our decision on the fact that there is nothing in the evidence to impugn the honestly and good faith of the councilmen in deciding as they did.

And now, June 25, 1928, this cause came on to be heard at this term, and, upon consideration thereof, it is ordered, adjudged and decreed that the relief prayed for in the bill be denied and that the bill of complaint be dismissed, at the costs of the complainant.

The prothonotary will enter this decree *nisi* and give notice of same to the parties or their counsel, and if no exceptions are filed within ten days this decree shall be entered by him as a final decree.

From Henry D. Maxwell, Easton, Pa.